**LAKE LORRAINE, INC., Plaintiff,**

v.

**AMERICAN TELEPHONE & TELEGRAPH and Natural Pipe Line Co., Defendants.**

**No. 73C 559 (A).**

United States District Court,
E. D. Missouri, E. D.

July 11, 1974.

---

Thurman, Nixon & Smith, Hillsboro, Mo., for plaintiff.

William L. Pannell, Festus, Mo., Edward F. Barnicle, Jr., Kansas City, Mo., for defendants.

## MEMORANDUM OPINION

HARPER, District Judge.

This is an action in two counts brought by Lake Lorraine, Inc., a Missouri corporation, against the American Telephone and Telegraph Company, a New York corporation (hereinafter referred to as AT&T), and the Natural Pipe Line Company, a Minnesota corporation (hereinafter referred to as Natural Pipe).

In Count I, plaintiff seeks to recover damages for an alleged leak in its lake allegedly caused by blasting operations performed by the defendants on or near plaintiff's property. In Count II, plaintiff seeks to recover damages for defendants' alleged destruction of timber and excavation of topsoil while allegedly trespassing on plaintiff's land. Plaintiff further seeks in Count II to recover treble damages pursuant to R.S. Mo. 537.340 for alleged destruction of trees growing on plaintiff's land for use, shade and ornament while allegedly trespassing on plaintiff's land.

This Court has jurisdiction based upon diversity of citizenship and amount under 28 U.S.C. § 1332.

The pleadings and testimony reveal that on May 4, 1973, AT&T and Natural Pipe entered into a contract (Plaintiff's Ex. 2), whereby Natural Pipe was to construct and install approximately 10.2 trench miles of buried telephone cable, a part of which was to run across plaintiff's land. On May 14, 1973, in American Telephone and Telegraph Company v. Lake Lorraine, Inc., et al., in Cause Number 44,204, Division Number 2, in the Circuit Court of Jefferson County, Missouri, that portion of plaintiff's land, property and rights described in the petition was ordered condemned for the uses and purposes as set out in the petition, and AT&T was given the right to take possession thereof immediately upon the filing of the Report of the Commissioners and the payment to the Clerk of the amount assessed by the Commissioners. The payment was made to the Clerk as required.

The Petition in Condemnation (Plaintiff's Ex. 3) shows in paragraph 5(a) that AT&T acquired a thirty-foot easement across plaintiff's land, plus in paragraph 7, AT&T acquired a temporary easement to clear and use land on each side of the above mentioned thirty-foot easement for the purpose of providing room for men and machinery to work and turn thereon while constructing and installing the communication systems to be located within the easement tract. In paragraph 8 of the petition, AT&T agreed to pay the actual damages to the realty (other than resulting from the clearing of the right of way).

The testimony at the trial establishes that all of plaintiff's land has been subdivided into lots as part of a lake development called Lake Lorraine, except a 95-acre tract across which AT&T's easement runs. The lake thereon was created by the construction of an earth-filled dam in the late 1950's which runs north and south. The dam is built on a bedding plane of impure limestone. The rock formation under the lake and dam consists of a layer of lime shale over a layer of limestone, which in turn is over a layer of lime shale, and so on. Where these different layers of lime shale and limestone come in contact with each other is called a bedding plane or zone of weakness along which water can flow. The layers of lime shale and limestone under the lake and dam are also jointed vertically, which means there are vertical fractures in these layers which could be penetrated by water. Thus, water could go down one of the vertical fractures and move along a bedding plane and could then surface elsewhere.

Plaintiff's lake has had a history of leaking due to no apparent external causes. Leaks have occurred in 1960, 1965, 1966, and again on two occasions in 1968. Each of these leaks was repaired by a method known as "grouting", which consists of drilling a hole down to the area of the suspected leak, inserting a pipe in the hole and pumping a substance, usually concrete—although the plaintiff used hot asphalt—down the pipe to block the leak. This method is only a temporry cure and must be repeated when the leaks reappear. Each of the above mentioned leaks was found to be about forty to fifty feet north of the northern end of the dam, and that is where the grouting was performed at a depth of sixty-eight to seventy-three feet.

Toward the end of June and into the first part of July, 1973, defendant, Natural Pipe, dug a seven-foot trench along AT&T's easement near and on plaintiff's property and laid a telephone cable pursuant to its contract with AT&T. At various points along AT&T's easement, as shown by Plaintiff's Exhibit 18, it was necessary for Natural Pipe to use dynamite to blast out rock in order to achieve a trench with a depth of seven feet.

Beginning on June 28, 1973, and on several occasions thereafter, residents from various points around the lake testified that they heard the defendants blasting and felt turbulence in the air and vibrations described by one witness as earth tremors. One witness at first believed the noise and vibrations to be

from sonic booms which occurred regularly over the area. The blasting caused dishes and windows to rattle and objects such as pictures to fall off of walls, but the only damage reported besides plaintiff's alleged damage to its lake was that of a homebuilder in the area, who reported that a rock had gone through the roof of a house that he was building (Plaintiff's Exhibits 7–11). There were no reports of broken windows, cracked foundations or broken septic tank connections in the area.

The first report that the plaintiff's lake was leaking was made by the plaintiff's lake manager who had been present and helped repair four of the prior leaks. He testified that after he heard the blasting on July 2, 1973, he checked the dam with a divining rod which indicated water flowing underground about forty to fifty feet north of the dam, the same area where the prior leaks had occurred and where the prior grouting had been performed. He then checked a creek bed about one-third of a mile northeast of the northern end of the dam which he had checked some two weeks before, and found it to be dry, but this time he found water flowing out of the creek bed as it had during prior leaks. On July 5, 1973, the lake manager and a resident of the lake again checked the creek bed and the manager found the waterflow had increased and that it was coming out of the ground in two different places in the creek bed and that some particles of asphalt were in the creek bed where the water was flowing.

There is conflict in the testimony as to the rate at which the lake is leaking, but everyone who stated an opinion on the subject agreed that it is leaking.

The issues presented to this Court under Count I are twofold. First, was the blasting operation carried on by the defendants in connection with the installation of the above mentioned telephone cable the proximate cause of the present leak or leaks in the plaintiff's lake? Second, if defendants' blasting operation is the proximate cause of the present leak or leaks in plaintiff's lake, what is the correct measure of damages, and what are the damages?

It is plaintiff's contention in Count I that the blasting operation carried on by the defendants on June 28, 1973, and thereafter, produced vibrations or shock waves which were transmitted along the path of an alleged geological fault which it alleges runs under Lake Lorraine, causing a displacement and compacting of the soil particles contained in the fault, thereby causing settling and consequent cracking of the substructures of Lake Lorraine resulting in a leak in the lake.

The law in the State of Missouri concerning blasting and damage to property by vibrations or concussions from blasting is stated in Summers v. Tavern Rock Sand Company, 315 S.W.2d 201, 203 (Mo.1958) as follows:

"In this state 'blasting is regarded as a work which one may lawfully do, providing he avoids injuring persons or property, and subject to his obligation to pay damages for any injury inflicted by his blasting.' Schaefer v. Frazier-Davis Const. Co., Mo.App., 125 S.W.2d 897. And in this state when damage to property is by vibration or concussion from blasting there is an invasion of the premises and liability irrespective of negligence quite as if the blasting had cast rocks or debris thereon. Stocker v. City of Richmond Heights, 235 Mo.App. 277, 132 S.W.2d 1116; Taylor v. Walsh, 193 Mo.App. 516, 186 S.W. 527; Johnson v. Kansas City Terminal R. Co., 182 Mo.App. 349, 170 S.W. 456; Annotation, 20 A.L.R.2d 1372, at pages 1383–1384."

Robert Knight, a subsurface geologist, and Dr. J. C. Stevens, a civil engineer with experience in soil mechanics and in the designing of lakes, both testified that based on log readings (Plaintiff's Exhibits 14, 15 & 16) from water wells drilled in the area, that there was approximately a 200-foot difference between the level of the top of the Jefferson City formation in the Lake Lorraine

and AT&T wells to the south and southwest of the lake and the Water District # 9 well to the northwest of the lake. This 200-foot difference in the level of the Jefferson City formation indicates what both Knight and Dr. Stevens believe to be a fault which runs in a northeast to southwest direction. Knight placed the fault to the northeast of the lake, while Stevens placed the fault as running directly under the lake. Knight also stated that the 200-foot difference in the level of the Jefferson City formation could be explained by what he called a small flexure, which is a normal change in the level of formations below the earth's surface.

Although Dr. Stevens is not an expert on blasting or the transmission of shock waves from blasting and has had no experience in repairing leaking lakes, he was of the opinion that the shock waves from the blasting operation of the defendants followed the earth's strata to the alleged fault and followed the fault, causing the loose soil particles therein to settle, resulting in fractures in the substructure of the lake's floor and thereby causing the lake to leak. Stevens also stated that the soil particles in the fault could be disturbed by such things as sonic booms or earthquakes as well as by shock waves.

The only competent expert testimony as to whether the defendants' blasting operations caused the plaintiff's lake to leak came from Dr. Arthur Cleaves. Dr. Cleaves is a consulting geological engineer and professor of geology at Washington University in St. Louis, Missouri. He qualifies as an expert on blasting, on the transmission of shock waves produced by blasting, on the construction of dams, and on the repairing of leaks in lakes and dams.

Dr. Cleaves first became familiar with the leaking problems at Lake Lorraine in 1960 when he was called in as a consultant with regard to a leak in the lake. He next inspected the lake and the surrounding terrain in January, 1974, and found two other sources of water flowing out of the ground in the area of the lake besides the one discovered by the lake manager on July 2, 1973. None of these sources of water could be positively identified as coming from the lake.

Dr. Cleaves testified that the blasting operation of the defendants had absolutely no effect on any leakage from the plaintiff's lake. He stated that there are three types of shock waves produced by every explosion. They are "P" waves, "S" waves, and horizontal waves. "P" and "S" waves are vertical waves which go down and are reflected up almost immediately by the first significantly dense layer they hit. The horizontal wave goes down and travels horizontally at a very shallow depth. It is the one that causes damage. The horizontal shock waves produced by the defendants' blasting up to and including July 2, 1973, the date the lake was first discovered to be leaking, could not have reached the plaintiff's lake due to the air gaps in the terrain between the lake and the points of blasting, and, therefore, could not have been the cause of the plaintiff's lake leaking.

The terrain between the lake and the blasting up to and including July 2, 1973, consists of two ridges with horizontal rock and two valleys, with the valley closest to the lake being about thirty-five feet deep. Since the trench in which the blasting took place was only seven feet deep and it was located on higher ground than the intervening valleys between the lake and the blasting, and since horizontal shock waves travel horizontally at very shallow depths and do not curve and are not conducted beyond air gaps such as the two intervening valleys between the lake and the points of blasting up to and including July 2, 1973, the horizontal shock waves could not have reached the area of the lake. If the horizontal shock waves had reached the area of the lake and had caused any damage to the rock strata under the lake they would have caused damage to septic tank connections in the area and there would have been slumps (small landslides) on the sides of the dam, none of which were reported.

Dr. Cleaves explained the testimony of witnesses who said they felt the ground shake as only their imagination, although they were testifying as honestly as possible. What these witnesses really felt was the air blast from the explosions and not the ground shaking. The air blast could be felt across the lake because the blasting was in such a shallow trench, resulting in the greatest force from the explosions being directed up into the air, thus causing a bulb of air that pressed out in all directions. If the air blast had been strong enough to cause damage to the rock strata under the lake there also would have been reports of damage to septic tank connections and slumping on the dam the same as if shock waves had reached the lake. In addition there would have been reports of broken windows and window panes in the area.

■ In light of all the evidence presented the plaintiff has failed to carry the burden of proof that the defendants' blasting operation caused plaintiff's lake to leak. There was no expert testimony at the trial to the effect that the shock waves from the blasting ever reached the plaintiff's lake, but to the contrary there was competent expert testimony that the shock waves never reached the plaintiff's lake. Also, the fact that there were no reports of broken windows or slumping on the dam or damage to septic tank connections weighs heavily against the plaintiff. Further, the leak or leaks in plaintiff's lake could have been caused by any occurrence that would disturb the soil in a fault. Plaintiff's witness, Dr. Stevens, named two such occurrences, earthquakes and sonic booms. The area of the lake is a "fly-way" for military planes and receives concussions regularly from sonic booms produced by these planes. The evidence further shows that the lake has a long history of leaking and that the method used to repair the prior leaks (grouting) is only a temporary cure, and finally, no one knows whether the lake began to leak before or after the defendants began their blasting operation in the area.

In Count II the plaintiff seeks to recover for alleged damage to timber and topsoil beyond the thirty-foot easement acquired by AT&T in American Telephone etc. v. Lake Lorraine, etc., supra. Plaintiff alleges in Count II, paragraph 7 of its complaint, that the defendants, while clearing the above mentioned thirty-foot easement, trespassed upon land owned by the plaintiff and violated section 537.340 R.S.Mo., V.A.M.S. Section 537.340 R.S.Mo. V.A.M.S. provides for treble damages "if any person shall cut down, injure or destroy or carry away any tree placed or growing for use, shade or ornament, or any timber, rails or wood standing, being or growing on the land of any other person, * * *."

Section 537.340 R.S.Mo., V.A.M.S., is tempered by 537.360 R.S.Mo., V.A.M.S., which provides that if a defendant had probable cause to believe that the land upon which the trees in question were standing was his own, then plaintiff is entitled only to recover single damages. Missouri courts have interpreted the term "probable cause" as used in Section 537.360 R.S.Mo., V.A.M.S. to mean "the existence of such facts as would lead a reasonably prudent person to believe that he had the lawful right to do the act charged to be a malicious trespass." Barnes v. Arkansas-Missouri Power Co., 220 Mo.App. 141, 281 S.W. 93, 96 (1926). What plaintiff ignores is the fact that in paragraph 7 of the condemnation petition (Plaintiff's Ex. 3) AT&T sought to have the Circuit Court of Jefferson County, Missouri, condemn "temporary easements to clear and use strips of land as required on each side of the land described in paragraph 5a" of the condemnation petition. The land described in paragraph 5a of the condemnation petition consisted of the above mentioned thirty-foot easement. The Circuit Court of Jefferson County, Missouri, in its Order of Condemnation entered on May 14, 1973, said:

"It is, therefore, ordered, adjudged and decreed that the lands, property

and rights be and stand condemned for the uses and purposes as set out in the petition; and that the plaintiff shall have the right to take possession or make use thereof immediately."

 What AT&T received in the condemnation proceedings was a thirty-foot easement plus a temporary easement to clear and use strips of land as it required on both sides of the thirty-foot easement. Therefore, it is apparent that the defendants herein had "probable cause" as that term is used in Section 537.360 R.S.Mo. to believe that they had a lawful right to clear land on either side of the thirty-foot easement described in paragraph 5a of the condemnation petition and, therefore, did not violate Section 537.340 R.S.Mo., V.A.M.S., providing for treble damages, and liability is limited to single damages.

In the state condemnation action pending in the Circuit Court of Jefferson County, Missouri, an order of condemnation has been entered by the court with respect to the easements in question, and a Commissioners' Award of $7,500.00 has been made and the money deposited by AT&T, to which both plaintiff and AT&T have filed exceptions. The only matter left to be adjudicated in the condemnation case is the matter of damages.

The Court must resolve under these facts whether the plaintiff is splitting its cause of action. As stated in Grue v. Hensley, 357 Mo. 592, 210 S.W.2d 7, 10 (1948), the test to determine whether a cause of action is single and cannot be split is "whether separate actions brought thereon arise out of the same 'act, contract or transaction'." In the instant case there are separate actions (the state condemnation action and the instant cause) arising out of the same "act, contract or transaction" with respect to the temporary easement abutting the thirty-foot easement.

The doctrine surrounding the rule against splitting a cause of action is in the nature of a rule of repose with the double purpose of protecting both the courts and the litigants from the harassment of repetitious litigation. Buder et al. v. Fiske et al., 174 F.2d 260, 268 (8th Cir. 1949). The state condemnation case was beyond the pleading stage when the cause before the Court was filed. The condemnation order had been entered by the state court and the Commissioners' Award paid into court, which in part pertained to what plaintiff here seeks to litigate in Count II. It is fundamental that causes of action should not be tried piecemeal as attempted herein.

Accordingly, for the above reasons the Court finds in favor of the defendants and against the plaintiff as to Count I, and Count II will be dismissed without prejudice.

This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the Clerk of the Court will prepare and enter the proper judgment in accordance with the Court's finding.